IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | CRIMINAL NO. 07-00349-CG |
| ELDA LOPEZ ) | |
| ) | |
| Defendant. ) | |

## ORDER

This matter is before the court on the motion of the Defendant, Elda Lopez ("Lopez") to communicate with the jurors that considered the facts of her case at her trial and found her guilty. (Doc. 195). Lopez makes this motion pursuant to Local Rule 47.2, alleging that four witnesses saw a prosecuting attorney talking to one or more jurors while the trial was recessed for a lunch break. Id. For the reasons stated below, Lopez's motion is **DENIED**.

## FACTUAL BACKGROUND

After a five day trial, Lopez the jury returned guilty verdicts on Friday, January 9, 2009, of multiple counts, including conspiracy to distribute cocaine, conspiracy to possess with intent to distribute cocaine, conspiracy to commit money laundering, and money laundering. (Doc. 91). Lopez now alleges that during the course of the trial, Assistant United States Attorney ("AUSA") Gloria Bedwell conversed with one or more jurors, an alleged violation of the court's instructions. (Doc. 195, p. 1).

1

In support of her motion, Lopez has submitted four affidavits from witnesses who attended the trial and claim to have seen AUSA Bedwell conversing with jurors. Additionally, three of the four affiants testified at an evidentiary hearing held before this court on February 3, 2012.

The first affidavit, dated September 30, 2011, is that of Jacqueline Alvarez, who stated that she is the best friend of co-defendant Aracely Lopez's daughter. (Doc. 195-1). Alvarez stated in her affidavit that on Wednesday, January 7, or Thursday, January 8, she saw AUSA Bedwell "walking next to the jurors and talking to them inside the court house as trial [sic] recessed for lunch." Id. at 1. Alvarez also stated that she was not within hearing distance and therefore could not hear the alleged conversation, and did not state whether she informed anyone of what she saw. Id. At the February 3, 2012, evidentiary hearing, Alvarez admitted that the daughter who is her best friend is defendant Elda Lopez, and that she saw Ms. Bedwell walking next the jurors and talking to one of them as they recessed for lunch on the <u>first</u> day of trial. (Emphasis supplied). She testified it was the first day, because the defense lawyer first planned on using her as a witness and she was excluded from the courtroom that day, however the lawyer changed his mind and she was in the courtroom as a spectator during the subsequent trial days. The court notes that the first day of trial was Monday, January 5, 2007, not the Wednesday or Thursday as reflected in the affidavit. Alvarez further testified that she did not immediately inform defense counsel of what she saw in the courthouse hallway, but instead spoke of it only with the defendant's sister, Sandra Lopez, as the two

2

women returned to Texas after the jury voted to convict. Alvarez testified that she swore out her affidavit two and a half years later after being contacted by defense lawyers.

The second affidavit, dated October 17, 2011, is that of Rosa Solis, who states that she has been "best friends" with defendant Elda Lopez since they both were ten years old. (Doc. 195-2, p. 1). Solis stated in her affidavit that on Tuesday, January 6, she saw AUSA Bedwell and people she describes as "government agents" talking to two or three jurors as they walked into the court house after lunch. Id. Solis did not state whether she was able to hear what was said, and stated that she did not inform anyone about what she saw. Id. At the February 3, 2012, evidentiary hearing, Solis revealed for the first time that on she also saw AUSA Bedwell talking to a female juror in a hallway of the courthouse as the trial recessed for lunch and while she and Jacqueline Alvarez were seated on a bench in the hallway nearby. Solis also reaffirmed the allegations she made in her affidavit, saying that she saw AUSA Bedwell talking to three jurors outside the front entrance to the courthouse as Bedwell and the jurors were returning from lunch. Solis once again admitted that she did not alert defense counsel about what she saw, and in fact waited for more than two and a half years until she was approached by defense counsel before pursuing the allegations.

The third affidavit, dated September 28, 2011, is that of Yesenia Ramirez, who is the niece of co-defendant Aracely Lopez. (Doc. 195-3). Ramirez stated that on either Tuesday, January 6, or Wednesday, January 7, she saw AUSA Bedwell

and people she describes as "government agents" talking with "a small mixed group of jurors" outside the court house as they "walked past the parking lot and on to a side street." Id. at 1. Ramirez also stated that she could not see where Bedwell and the jurors went once they were on the side street, and that she did not tell anyone about what she saw. Id. Ramirez did not testify at the February 3, 2012, hearing.

The fourth affidavit, dated September 28, 2011, is that of Yolanda Ramirez, who is the sister of co-defendant Aracely Lopez. (Doc. 195-4). In her affidavit, Ramirez stated that a few days after the trial started, she saw AUSA Bedwell walking and talking outside the courthouse with one male and one female juror during the lunch break. Id. Ramirez stated that she was with Jacqueline Alvarez when she witnessed this, but Alvarez's affidavit makes no mention of seeing Bedwell outside of the courthouse. See Doc. 195-1. Ramirez also states, somewhat contradictorily, that she saw this happen "everyday of the trial," and that she informed her sister's attorney, Domingo Soto. Id. at 1-2. Mr. Soto submitted his own affidavit in which he states that neither Ramirez nor anyone else reported such a breach of the "juror/lawyer no-contact protocol," and seriously doubts that any such breach occurred. (Doc. 200-1, p. 1). Soto confirmed his affidavit by testifying before the court at the February 3, 2012, evidentiary hearing. During that testimony, he also added that had anyone told him of contact with a juror by the prosecution, he would have taken action by at least informing the court.

4

Ramirez's testimony at the February 3 evidentiary hearing was no less contradictory than her affidavit. At various points on direct and cross examination, Ramirez stated that she saw AUSA Bedwell "together" with jurors, but did not see her talking; alternatively, she stated that she saw AUSA Bedwell talking with jurors, but does not know what was said. When confronted on cross examination with her affidavit, which stated that she saw Bedwell interacting with jurors every day of the trial, Ramirez claimed that she could not remember if she saw this every day or not. Ramirez also testified that she saw AUSA Bedwell talking to a male and a female juror, but admitted on cross examination that she cannot remember what those jurors looked like because of the passage of three years' time. Furthermore, Ramirez testified that she recalls the court warning the jurors not to have any contact with the attorneys in the case, but also freely admitted that she does not speak English and testified through a Spanish interpreter.

In her affidavit, AUSA Bedwell "emphatically" denied that she had any contact with any jurors in the Lopez trial, or that she in any way conducted herself unethically. (Doc. 200-1, p. 4). She also asserted that it is "ludicrous to believe that improper conduct involving jurors and government personnel would be conducted in the open, and in plain sight of court personnel and defendant family members." <u>Id.</u> at 5. Similarly, the two government agents who participated in the Lopez investigation and who were present at the Lopez trial, IRS Special Agent Victor Henken and FBI Special Agent Ruth Kroona, denied that they had any contact with jurors. (Doc. 200-1, pp. 8-11). AUSA Bedwell and Special Agents Henken and

5

Kroona also asserted that, during the course of the trial, they typically ate their lunch in the U.S. Attorney's trial preparation room in the courthouse, rather than venture out of the courthouse to eat. (Doc. 200-1, pp. 9 and 11). Bedwell, Henken and Kroona stated that the one day that they did leave the court house for lunch, none of them engaged any jurors in conversation or had any contact with jurors. <u>Id.</u> Bedwell, Henken, and Kroona's testimony at the February 3 evidentiary hearing was substantially the same as what was contained in their affidavits. At the hearing, AUSA Bedwell also noted that the normal courtroom procedure during trial is for the court security officer ("CSO") to escort the jury from the courtroom before anyone else leaves the courtroom, making it unlikely that she would have the opportunity to approach a juror even if she were so inclined.

The government also pointed to alleged inconsistencies among the four affidavits and inconsistencies between the affidavits and the live testimony offered by three of the four affiants. For example, Jacqueline Alvarez claims that she saw AUSA Bedwell walking next to the jurors and talking to a "lady juror" as the court recessed for lunch on Wednesday or Thursday during the week of the trial. (Doc. 195-1). Yet Rosa Solis, who claimed that she was with Jacqueline Alvarez, made no mention in her affidavit of seeing AUSA Bedwell talking to a juror in the courthouse hallway, instead asserting that she saw AUSA Bedwell plus two government agents walking and talking with jurors outside the courthouse on Tuesday. (Doc. 195-2). It was only when she testified at the February 3 evidentiary hearing that Solis claimed to have seen Bedwell talking to a juror in the hallway. Conversely, Alvarez

made no mention in her affidavit or her testimony of seeing AUSA Bedwell talk to jurors outside the courthouse or in the front lobby of the courthouse.

Also, Yesenia Ramirez claimed to have seen AUSA Bedwell and "government agents" talking to jurors outside the court house on Tuesday, January 6 or Wednesday, January 7 and asserted that she was with Yolanda Ramirez and Iresema Lopez. (Doc. 195-3). Yolanda Ramirez, however, made no mention in her affidavit of seeing any government agents with AUSA Bedwell and the jurors. (Doc. 195-4). Furthermore, Yolanda Ramirez claimed that she was with Yesenia Ramirez, Iresema Lopez, and Jacqueline Alvarez , whereas Yesenia Ramirez made no mention of Alvarez at all. Id. And, as stated, supra, Alvarez made no mention in either her affidavit or at the evidentiary hearing of seeing AUSA Bedwell talking to jurors outside the courthouse, nor does she mention having been with either Yesenia or Yolanda Ramirez. See Doc. 195-1.

The trial transcript in this case shows that the jury was instructed by the court after they were selected and before they went to lunch on the first day as follows:

> Now, although you've been selected as jurors in this case, you have not yet heard any of the evidence nor heard any of the law on this case. So you can't be going out and trying to find out anything else about this case. You have to decide this case solely on the law and the evidence as given to you in that courtroom. Do not discuss the case among yourselves. Do not discuss the charges among yourselves. Just put it out of your mind until you come back at 2 o'clock to begin your service as jurors in this case. Now, at this time you may go downstairs and check out . . . with the jury assembly clerk and be back in the jury assembly room by 2 P.M. to begin your service as jurors .

(Doc. 166, pp. 97-98). The transcript further shows that the jury was recessed before the lawyers left the courtroom. (Doc. 166, p. 98).

In the preliminary instructions to the jury at the beginning of the case that afternoon, the Court gave the following instruction:

> First, I instruct you that during the trial you are not to discuss the case with anyone or let anyone discuss the case with you. Until you retire to the jury room at the end of the case to deliberate on your verdict, you are simply not to talk about the case. If anyone should try to talk to you about it, please report it to the Court promptly.

(Doc. 167. pp. 16-17). There was no specific admonition by the Court that the jurors were to have no contact whatsoever with the lawyers. Whenever the court recessed the jury for a break, for lunch, or at the end of each day, the Court reminded the jurors that they were not to discuss the case with anyone, or to allow anyone to discuss it with them. (Doc. 167 at p. 69; Doc. 168 at pp. 65, 118, 164, 241-242; Doc. 169 at pp. 79, 140, 216-217, 248; Doc. 170 at pp. 61, 110, 174, 230; Doc. 171 at pp. 89, 129).

## STATEMENT OF THE LAW

"Where there are allegations of extraneous information, outside influence or other jury misconduct, the decision whether to investigate rests in the sound discretion of the district court." United States v. Darby, 744 F.2d 1508, 1540 (11th Cir. 1984) (citing United States v. Barshov, 733 F.2d 842, 850 (11th Cir. 1984); United States v. Lopez, 728 F.2d 1359, 1363 (11th Cir. 1984); United States v. Williams, 716 F.2d 864, 865 (11th Cir. 1983); United States v. Edwards, 696 F.2d 1277, 1282 (11th Cir. 1983)). See also United States v. Caldwell, 776 F.2d 989, 997

(11th Cir. 1985). Courts "must only have a hearing on possible extraneous influences on the jury's deliberations if [the affidavits] warrant one." United States v. Siegelman, 467 F.Supp.2d 1253, 1272 (M.D. Ala. December 13, 2006) (citing United States v. Venske, 296 F.3d 1284, 1290 (11th Cir. 2002)).

"In any trial, there is initially a presumption of jury impartiality; prejudice will not be presumed, but can be demonstrated by a defendant by a preponderance of credible evidence." United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert. denied, 444 U.S. 827 (1979) (citations omitted). "Such prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations; any 'prejudicial factual intrusion' denies a defendant [her] rights to trial by an impartial jury and to challenge the facts adverse to [her] that are made known to the jury." Id. (quoting United States v. Howard, 506 F.2d 865, 866 (5th Cir. 1975); Remmer v. United States, 347 U.S. 227, 229 (1954)). "The defendant bears the burden of establishing that extrinsic matters have been considered by the jury during its deliberations." United States v. Ayarza-Garcia, 819 F.2d 1043, 1051 (11th Cir. 1987). It is only when the defendant has made a colorable showing of extrinsic influence that the court must investigate the asserted impropriety. Id. Such a colorable showing must consist of evidence that is "clear, strong, substantial and incontrovertible …" United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990) (citing Barshov at 851).

"Cases dealing with the degree of investigation required fall along a continuum focusing on two factors: the certainty that some impropriety has

occurred and the seriousness of the accusation." United States v. Ayarza-Garcia, 819 F.2d 1043, 1051 (11th Cir. 1987) (citing United States v. Caldwell, 776 F.2d 989, 998 (11th Cir. 1985)). "The more speculative or unsubstantiated the allegation of misconduct, the less burden there is to investigate; the more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate." Id.

## LEGAL ANALYSIS

The seriousness of the accusation that the prosecution had ex parte conversation with a juror or jurors self-evident. The Supreme Court, in Maddox v. United States, 146 U.S. 140, 150 (1892), stated that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." The Fifth Circuit has interpreted this language more loosely, however, stating that "each case must depend upon its own facts." United States v. Betner, 489 F.2d 116, 119 (5th Cir. 1974).[1] Thus, there is no "rigid per se rule automatically requiring the reversal of a conviction for any communication between jurors and attorneys or other third persons." Id.

Still, though, in the few cases that address this specific scenario, the courts of appeal nevertheless reversed and remanded district courts that permitted the case

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding all Fifth Circuit precedent prior to October 1, 1981.

to proceed before juries where even some of the jurors were alleged to have "at least … established a social contact with the prosecuting attorney." Pekar v. United States, 315 F.2d 319, 322 (5th Cir. 1963); see also Betner, supra.

What distinguishes this case from Pekar and Betner is the fact that Lopez raised her allegations more than two and a half years after the jury returned a guilty verdict, whereas the allegations in the cited cases were brought to the courts' attention before those cases went to the jury.[2] See Betner at 117; see also Pekar at 322. Lopez offers no explanation for such a long delay. Nor does she offer any explanation for the contradictions between and among the affiants and witnesses who testified on her behalf at the evidentiary hearing, as discussed, supra.

After careful review and consideration of the affidavits and testimony presented by Lopez, the court finds that she has failed to meet her evidentiary burden of proof by a preponderance of credible evidence. See Winkel, 587 F.2d at 714. The court finds that the credibility of the factual accounts of the government witnesses far outweighs the credibility of the accounts of prosecution contact with jurors given by the defense witnesses. In addition, given that the court instructed the jury on numerous occasions about having no communications about the case with anyone, and specifically asked the jurors to report any such conduct to the court immediately, it is certainly more probable than not that no such conduct occurred. Because "[t]he duty to investigate arises only when the party alleging

---

[2] In Pekar, defense counsel objected to the composition of the jury panel being seated, while in Betner, defense counsel moved for a mistrial; both were denied by the respective district courts. See Pekar at 117 and Betner at 322.

11

misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality," <u>United States v. Barshov</u>, 733 F.2d 842, 851 (11th Cir. 1984), Lopez's motion for leave to contact jurors is hereby **DENIED.**

**DONE** and **ORDERED** this 8th day of February 2012.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE